IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 00-6115-CR-DIMITROULEAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| KIRK STEWART, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## *SUPPLEMENTAL*
## OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS

COME NOW the Defendant, KIRK STEWART, by and through his undersigned attorney, pursuant to Rule 32 of the Federal Rules of Criminal Procedure and Administrative Order No: 95-02, and files this Supplement to the Objections to the Presentence Investigation Report (PSR) which have been filed in this case. References to page and paragraph numbers are to the corresponding portions of the PSR and are provided as a convenience to the Court.

### PART A.  THE OFFENSE

Role Assessment

1. Pages 5 - 6, Paragraphs 8 and 9. The Defendant disputes both the facts giving rise to the role assessment and the legal basis for the role assessment in this



case. The Defendant disputes the factual assertion that he "recruited" Michele Blackwood to be a courier in this case. The statements attributed to Blackwood concerning a previous trip to the United States have no relevance to the matter before the Court at this time for sentencing. The Defendant further disputes the conclusion reached by the Probation Officer, which is apparently the legal justification for the role adjustment, that he was a "supervisor or leader in this case." The Government bears the burden of establishing the basis for the role enhancement in this case. *U.S. v. Glinton*, 154 F.3d 1245 (11th Cir. 1998).

### Offense Level Computation

2. Page 7, Paragraph 18. The Defendant disputes the two level adjustment based upon the assessment by the Probation Officer that he was "the supervisor over Blackwood."

3. Page 7, Paragraph 22. Based upon the Defendant's position that he is not subject to a two level upward adjustment for his role in the offense, he submits that his Total Offense Level should be 26.

### CONCLUSION

The foregoing constitutes the Defendant's Position with Respect to Sentencing Factors and his Objections to the Presentence Investigation Report. He submits that his objections should be sustained and that his position with respect the various sentencing factors is correct. The Defendant would therefore request that the Court direct the Probation Officer to correct the Report to reflect the appropriate facts and

computations and to determine the appropriate guidelines range.

DATED this 25th day of September, 2000.

JOHN R. HOWES, ESQ.
JOHN R. HOWES, P.A.
Counsel for Defendant
633 S.E. 3rd Ave., Suite 4F
Ft. Lauderdale, Fl. 33302
Telephone: 954.763.6003
Fax No: 954.462.2255
Fla. Bar No: 219193

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy hereof was furnished to Assistant U.S. Attorney Robin S. Rosenbaum, 500 E. Broward Blvd., Suite 700, Ft. Lauderdale, Fl., 33301, and to Marilyn G. Westfield, U.S. Probation Officer, 300 N.E. 1st Ave., Miami, Fl. 33312-2126 by Regular Mail and via facsimile and to Kirk Stewart, Reg. No. 60645-004, P.O. Box 019120, Miami, Fl., 33101-9120 by Regular Mail this 25th day of September, 2000.

JOHN R. HOWES, ESQ.

\object.psi stewart

3

(Cite as: 154 F.3d 1245)

**UNITED STATES of America, Plaintiff-Appellee,**
v.
**Ronald GLINTON, Morris McFadden, Timothy Hatten, Lavon Heath, Albert Davis, Defendants-Appellants.**

No. 93-4350.

United States Court of Appeals,
Eleventh Circuit.

Sept. 14, 1998.

Defendants were convicted in the United States District Court for the Southern District of Florida, No. 90-8065-CR-NCR, Norman C. Roettger, J., of various narcotics offenses, and they appealed. The Court of Appeals, Lay, Senior Circuit Judge, held that: (1) evidence was insufficient to establish existence of single conspiracy, as alleged in indictment; (2) variance was not prejudicial and did not require reversal; (3) drug task force agents complied with requirements of Florida's wiretap statute when they obtained amendment to wiretap order; (3) search warrant was supported by probable cause; (4) Terry stop of defendant's car was supported by reasonable suspicion; (5) evidence was sufficient to support convictions; (6) amendment to Sentencing Guidelines required remand for district court to determine whether adjustment to defendant's sentence was warranted; and (7) evidence was insufficient to support managerial role upward adjustment.

Affirmed in part and remanded for resentencing.

## [1] CONSPIRACY k43(12)

91k43(12)
Evidence in narcotics prosecution that defendants purchased large amounts of cocaine from same supplier, cooked it, and distributed it as crack was insufficient to establish existence of single conspiracy, as alleged in indictment; evidence showed that supplier sold cocaine to several independent buyers, and thus engaged in several clusters of conspiracies. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401, 406, as amended, 21 U.S.C.A. §§ 841(a)(1), 846.

## [2] CONSPIRACY k24(2)

91k24(2)
In order to constitute a single conspiracy there must be a single enterprise which sets up a common goal connecting each defendant.

## [3] CONSPIRACY k43(12)

91k43(12)
Prejudice caused by variance between charge of a single conspiracy and the proof of multiple conspiracies generally is measured in terms of whether the defendants were deprived of fair notice of the crimes for which they were being tried, and whether the spillover of the proof of other crimes prejudiced them.

## [4] CONSPIRACY k43(12)

91k43(12)
Variance between indictment charging single narcotics conspiracy, and proof at trial showing multiple conspiracies, was not prejudicial to defendants and did not require reversal, where defendants were fairly apprised of their charged activity in purchasing cocaine from same supplier and distributing it as crack, jury instructions limited likelihood of any spillover of evidence among conspiracies, and jury returned different verdicts on different counts as to different defendants. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401, 406, as amended, 21 U.S.C.A. §§ 841(a)(1), 846.

## [5] FEDERAL COURTS k404

170Bk404
Generally, federal law governs the admissibility of tape recordings in federal criminal cases, and complaints that the evidence was obtained in violation of state law are of no effect.

## [6] TELECOMMUNICATIONS k514.1

372k514.1
Drug task force agents who had obtained order authorizing wiretap of suspect's cellular telephone complied with requirements of Florida's wiretap statute when, six days later, agent verbally requested, and state trial judge verbally approved, the interception of suspect's new cellular telephone number; other than change in suspect's number, relevant facts, including continued existence of probable cause, remained unchanged. West's F.S.A. §§ 934.06, 934.09(1).

## [7] TELECOMMUNICATIONS k514.1

372k514.1
Even assuming that change in suspect's cellular telephone number rendered original wiretap warrant invalid under Florida's wiretap statute, any infirmity was cured less than 24 hours later when drug task force agents filed application to amend the original wiretap application, where amendment incorporated by reference a copy of original application and authorization and made it clear that all relevant facts presented to the court the previous week, with the exception of the actual number, were still applicable. West's F.S.A. §§ 934.06, 934.09(1).

## [8] TELECOMMUNICATIONS k514.1

372k514.1
Failure of application to amend to mention wiretap of another suspect's telephone authorized by court in original wiretap order was irrelevant in determining whether amendment, seeking to change telephone number of tapped cellular telephone, satisfied requirements of Florida's wiretap statute. West's F.S.A. § 934.09(1)(e).

## [9] DRUGS AND NARCOTICS k188(3)

138k188(3)
Affidavit supporting search warrant issued after warrantless entry into defendant's apartment contained sufficient information from independent sources to

establish probable cause to search, although affidavit stated that information came from confidential informant instead of wiretap of codefendant's cellular telephone and misstated facts regarding delivery of cocaine to apartment; issuing magistrate was told that informant referred to in affidavit was actually a wiretap, and factual discrepancies were not deliberate and did not undermine probability that defendant possessed cocaine. U.S.C.A. Const.Amend. 4.

**[10] SEARCHES AND SEIZURES k104**
349k104
Magistrate judge acted in a neutral and detached manner when he issued warrant authorizing search of defendant's apartment, although supporting affidavit stated that information was obtained from "confidential informant," and government agents told judge that the informant was actually a wiretap on codefendant's cellular telephone and that they wanted to preserve secrecy of the wiretap in order to make future arrests; receiving such information did not make the magistrate a "tool" for the prosecution.

**[11] SEARCHES AND SEIZURES k113.1**
349k113.1
The issue the magistrate judge must always confront in determining whether to issue a search warrant is whether, from the totality of circumstances, there exists probable cause to justify the issuance of the warrant. U.S.C.A. Const.Amend. 4.

**[12] SEARCHES AND SEIZURES k112**
349k112
Minor discrepancies in search warrant affidavit should not subvert an officer's good-faith revelations of facts establishing probable cause. U.S.C.A. Const.Amend. 4.

**[13] CRIMINAL LAW k394.4(4)**
110k394.4(4)
Search warrant affidavit submitted to magistrate judge was not bare-boned, making good faith exception to exclusionary rule applicable to evidence seized during search of defendant's apartment pursuant to warrant, where judge's probable cause determination was based on information revealed during wiretap of codefendant's cellular telephone, indicating that defendant had attempted to purchase drugs on several occasions, and on results of police surveillance. U.S.C.A. Const.Amend. 4.

**[14] CRIMINAL LAW k394.4(4)**
110k394.4(4)
One of the exceptions to the good-faith exception to the exclusionary rule is that search warrant affidavit must not be a "bare-bone" statement of nothing more than conclusory allegations. U.S.C.A. Const.Amend. 4.

**[15] ARREST k63.5(6)**
35k63.5(6)
Terry stop of defendant's car during drug investigation was supported by reasonable suspicion, although police officers who stopped car were not members of drug task force conducting the investigation; defendant's car was stopped after task force surveillance agents observed him meeting with a known cocaine dealer, and depart carrying a red gym bag, and the police officers stopped defendant's car upon radioed information from the task force. U.S.C.A. Const.Amend. 4.

**[16] SEARCHES AND SEIZURES k22**
349k22
A canine sniff is not considered a "search" for Fourth Amendment purposes. U.S.C.A. Const.Amend. 4.
See publication Words and Phrases for other judicial constructions and definitions.

**[17] CONSPIRACY k47(12)**
91k47(12)
Evidence, including testimony of cooperating codefendant, was sufficient to support convictions for conspiracy to possess with intent to distribute cocaine, conspiracy to manufacture and possess with intent to distribute cocaine base, and manufacturing and distributing cocaine and crack; defendant purchased three kilograms of cocaine from codefendant, and complained that two of the kilograms were of insufficient quality to withstand the conversion to crack, and codefendant then attempted to purchase more cocaine to sell to defendant.

**[17] DRUGS AND NARCOTICS k123.1**
138k123.1
Evidence, including testimony of cooperating codefendant, was sufficient to support convictions for conspiracy to possess with intent to distribute cocaine, conspiracy to manufacture and possess with intent to distribute cocaine base, and manufacturing and distributing cocaine and crack; defendant purchased three kilograms of cocaine from codefendant, and complained that two of the kilograms were of insufficient quality to withstand the conversion to crack, and codefendant then attempted to purchase more cocaine to sell to defendant.

**[17] DRUGS AND NARCOTICS k123.3**
138k123.3
Evidence, including testimony of cooperating codefendant, was sufficient to support convictions for conspiracy to possess with intent to distribute cocaine, conspiracy to manufacture and possess with intent to distribute cocaine base, and manufacturing and distributing cocaine and crack; defendant purchased three kilograms of cocaine from codefendant, and complained that two of the kilograms were of insufficient quality to withstand the conversion to crack, and codefendant then attempted to purchase more cocaine to sell to defendant.

**[18] CRIMINAL LAW k1144.13(3)**
110k1144.13(3)
When reviewing the sufficiency of evidence to sustain a conviction, the evidence is viewed in the light most favorable to the government.

**[19] CRIMINAL LAW k1159.2(8)**
110k1159.2(8)
When reviewing the sufficiency of evidence to sustain a conviction, the Court of Appeals must accept all of a jury's inferences and determinations of witness credibility.

**[19] CRIMINAL LAW k1159.4(1)**
110k1159.4(1)
When reviewing the sufficiency of evidence to sustain a conviction, the Court of Appeals must accept all of a jury's inferences and determinations of witness credibility.

**[20] DRUGS AND NARCOTICS k133**
138k133
In calculating base offense level under Sentencing Guidelines for defendant convicted of narcotics offenses, whether codefendant delivered four kilograms of cocaine to defendant during the months they knew each other, as claimed by defendant, or whether codefendant delivered approximately 100 kilograms during that period, as stated by codefendant, was credibility issue for sentencing court. 18 U.S.C.A. § 3742(e); U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[21] CRIMINAL LAW k1312**
110k1312
District court may consider reliable hearsay evidence at sentencing. U.S.S.G. § 6A1.3(a), p.s., 18 U.S.C.A.

**[22] CRIMINAL LAW k1181.5(8)**
110k1181.5(8)
Amendment to sentencing guidelines establishing an upper limit of 38 on base offense levels calculated using drug quantity did not permit Court of Appeals to retroactively reduce defendant's sentence, but did require remand for district court to determine in its discretion whether adjustment to defendant's sentence was warranted. 18 U.S.C.A. § 3582(c)(2); U.S.S.G. § 1B1.10(c), p.s.; U.S.S.G. App. C, 18 U.S.C.A.

**[23] CRIMINAL LAW k996(1.1)**
110k996(1.1)
A court's power to reduce sentences under statute governing reductions in sentences when the sentencing range has been lowered is discretionary. 18 U.S.C.A. § 3582(c)(2).

**[24] CRIMINAL LAW k1251**
110k1251
Evidence that defendant purchased more cocaine from supplier than other defendants, possessed $140,000 in cash and had resold cocaine to two other persons was insufficient to support managerial role upward adjustment when sentencing him for narcotics offenses under Sentencing Guidelines. U.S.S.G. § 3B1.1, 18 U.S.C.A.

**[25] CRIMINAL LAW k1158(1)**
110k1158(1)
The district court's determination that defendant qualifies for a managerial role enhancement under Sentencing Guidelines is reviewed under the clearly erroneous rule. U.S.S.G. § 3B1.1, 18 U.S.C.A.

**[26] CRIMINAL LAW k1251**
110k1251
Even if the quantity of drugs purchased by defendant is large enough to infer that the defendant knew they would be resold, a managerial role enhancement under Sentencing Guidelines is inappropriate absent evidence the defendant actively recruited buyers or directed their activities. U.S.S.G. § 3B1.1, 18 U.S.C.A.

**[27] CRIMINAL LAW k1251**
110k1251
A mere buyer/seller relationship is not a sufficient basis to assess a managerial role enhancement under Sentencing Guidelines. U.S.S.G. § 3B1.1, 18 U.S.C.A.

**[28] CRIMINAL LAW k1311**
110k1311
The government has the burden of proving by a preponderance of evidence the existence of the aggravating role at sentencing. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[29] CRIMINAL LAW k1313(2)**
110k1313(2)
A managerial role enhancement cannot be imposed under Sentencing Guidelines unless there is a preponderance of evidence that the defendant supervised or controlled others, or exercised some management responsibility over the activities of the criminal organization. U.S.S.G. § 3B1.1, 18 U.S.C.A.
  \*1248 Ruben M. Garcia, Ft. Lauderdale, FL, for Glinton.

  Robert E. Adler, Asst. Fed. Pub. Defender, Ft. Lauderdale, FL, for Quince.

  Brenda G. Bryn, Asst. Fed. Pub. Defender, Miami, FL, for Heath.

  Philip R. Horowitz, Miami, FL, for Davis.

  Russell K. Rosenthal, Zaremba & Rosenthal, Miami, FL, for Lowe.

  Tom Almon, Miami, FL, for McFadden.

  Timothy Hatten, Beaumont, TX, pro se.

  Andrew Grosso, Washington, DC, for Hatten.

  Roberto Martinez, Carol Herman, U.S. Attys., Miami, FL, for Plaintiff- Appellee.

  Appeals from the United States District Court for the Southern District of Florida.

  Before HATCHETT, Chief Judge, and RONEY and LAY [FN\*], Senior Circuit Judges.

> FN\* Honorable Donald P. Lay, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

LAY, Senior Circuit Judge:

  Twenty defendants were indicted by a grand jury in Fort Lauderdale, Florida, in connection with the buying and selling of cocaine and the manufacturing of crack cocaine. After several defendants pled guilty, thirteen defendants proceeded to a joint trial in August 1992. Guilty charges were returned on various counts for five

defendants: Ronald Glinton, Lavon Heath, Timothy Hatten, Albert Davis and Morris McFadden. The five defendants now bring this appeal. [FN1]

> FN1. A sixth defendant, Ralph Lowe, was found not guilty of conspiracy to manufacture and possess with intent to distribute crack cocaine and cocaine hydrochloride. He pled guilty to possession with intent to distribute crack cocaine. While Lowe initially was part of this consolidated appeal, in December 1997 this court granted Lowe's third set of motions to sever and expedite his appeal. His sentence was vacated, and the case was remanded to the district court for resentencing.

Background

In 1988, a joint state and federal task force began an undercover investigation into an alleged cocaine-trafficking organization run by Ronald Glinton. On April 17, 1990, Palm Beach County Circuit Judge Walter Colbath granted an application for a wiretap on the cellular phone of Jose Martin, who the task force suspected to be Glinton's cocaine supplier.

Six days later, police learned Martin had changed his cellular phone number. Assistant State Attorney Robert Shepherd telephoned Judge Colbath and told him of the change. The judge gave a verbal approval to change the wiretap to the new number. A written addendum to the original application was filed one day later on April 24, 1990.

*1249 On April 27, 1990, agents monitored several calls between Martin and his cocaine supplier, Reinaldo Acosta. Acosta told Martin he had six kilograms of cocaine available for a price of $23,500 per kilogram. Martin told Acosta he would need to check with his "associate" before confirming a sale. Martin then called Heath and asked whether he was ready to purchase six kilograms of cocaine. Heath indicated that he first needed to count his money.

Martin and Acosta met later that day at the residence of Acosta's brother, Carlos Acosta. Carlos Acosta's apartment, located on the same street as Heath's residence, was being watched by surveillance agents. Martin left Carlos Acosta's apartment carrying a blue bag, presumably containing cocaine, and drove to Heath's apartment. Heath paid Martin $144,000 for the cocaine. Martin placed the money in the bag and returned to give the money to Acosta. Carlos Acosta then left his apartment carrying the blue bag and drove away.

Agents made the decision to stop Carlos Acosta's car. After Acosta consented to a search, officers confiscated the bag containing the large amount of cash, but released Acosta in order to preserve the secrecy of the wiretap. At 8:05 p.m. the same evening, Martin called Reinaldo Acosta and learned Carlos had been stopped with the money. When Martin asked how this could have happened, Reinaldo said: "I think they were watching you two." See Heath Br.App. Agents later testified that this conversation raised the possibility that people inside Heath's apartment would be alerted to police surveillance, and that evidence might be destroyed.

Twenty-five minutes later, at 8:30 p.m., agents broke into Heath's apartment, finding cocaine, wrapping material, and crack cocaine "cooking" in the kitchen. Agents detained four men, including Heath. Ten minutes later, at 8:40 p.m., ASA Shepherd and Sheriff's Deputy Marcos Martinez went to the home of Palm Beach County Circuit Judge James Carlisle to obtain a warrant to search Heath's apartment.

In the affidavit accompanying the warrant application, agents stated that the information leading to the entry of Heath's apartment came from "a past reliable confidential informant," and did not mention the wiretap of Martin's cellular phone. See Government's Exhibit S-4. Agents later testified this was done intentionally in order to protect the secrecy of the wiretap and continue the investigation. ASA Shepherd and Martinez said that they verbally advised Judge Carlisle that the past reliable confidential informant was actually an ongoing wiretap previously authorized by Judge Colbath. Judge Carlisle signed the warrant, and agents returned to search Heath's apartment. Heath and three other men subsequently were arrested.

Continuing to act on information from the wiretap of Martin's phone, the task force conducted surveillance on the home of Martin's associate, Rafael Ruano. On May 4, 1990, agents observed Timothy Hatten arrive at Ruano's apartment, meet with Martin, and leave fifteen minutes later carrying a red gym bag. Agents followed Hatten, and radioed instructions to two other officers who then stopped Hatten's car. Hatten refused to consent to a search. Task force agents arrived with a drug-sniffing dog, which walked around the car twice before scratching and biting at the driver-side door. Agents searched the car and found 279 grams of cocaine and a small amount of marijuana under the driver's seat.

Prior to the stop of Hatten's car, the task force had obtained a warrant from Judge Colbath to search Hatten's apartment. Once again, the affidavit in support of the search warrant stated it was "based on the information received from a past reliable CI [confidential informant]...." No mention was made of a wiretap. Inside Hatten's apartment, officers found packages of crack cocaine, bundles of $100 bills, a kilogram of cocaine and other evidence of drug trafficking. Hatten and his girlfriend, Linda Curry, were arrested.

The government contends Albert Davis introduced Martin to several buyers, including Heath, McFadden, and Glinton. Agents also observed Martin making direct sales of cocaine to Davis on April 20, 1990, and again on May 14, 1990. The task force operation ended on June 14, 1990, when agents arrested *1250 Glinton in his home with 502 grams of cocaine.

The Appeal

On appeal, four of the defendants assert there was a material variance between the indictment, charging a single conspiracy, and the government's proof of multiple conspiracies presented at trial. In addition, Heath challenges the legality of the wiretap under Florida state law as well as the search of his apartment on Fourth Amendment grounds. Heath also challenges an enhancement under the sentencing guidelines classifying him as a "manager." Hatten challenges the legality of the search of his automobile as well as his home. He also asserts denial of a fair trial and ineffective assistance of counsel because the trial judge failed to rule before trial on his motion to suppress evidence seized from his home. McFadden and Davis both challenge their sentences. In addition, Davis asserts there was insufficient evidence to sustain his conviction.

We find the district court erred in sentencing Heath by assessing a two- point upward adjustment under § 3B1.1 of the sentencing guidelines for serving in a managerial role. We therefore remand to the district court Heath's conviction for resentencing. We likewise remand Davis' sentence to the district court to determine whether an adjustment is warranted under Amendment 505 of the guidelines. See U.S.S.G.App. C. amend. 505 (1997). We otherwise find there exists no prejudicial error as to each of the defendants and affirm their convictions. [FN2]

> FN2. The district court sentenced all appellants to terms of incarceration and supervised release (Glinton-concurrent terms of life imprisonment on Counts 1, 2, 9, and 10, R.8 at 946); (Heath-concurrent terms of 400 months' imprisonment on Counts 1, 2, 13, 14, and 15, R.8 at 1007); (Hatten-concurrent terms of life imprisonment on Counts 1, 2, 16, 17, 18, and 28, R.8 at 1009); (McFadden-concurrent terms of 188 months' imprisonment on Counts 2 and 7, R.8 at 1006); (Davis-concurrent terms of 360 months' imprisonment on Counts 1, 2, 26, 27, R.9 at 1078).

Conspiracy and Prejudicial Variance

[1] The government charges that from June 1988 to May 1990, Martin, who testified for the prosecution after his guilty plea, sold large amounts of cocaine to each of the defendants. Much of the information obtained by the government was from a wiretap placed on Martin's cellular phone. Martin's cocaine supplier was Reinaldo Acosta. Martin was acquainted with Davis, who on separate occasions introduced Glinton, Heath, and McFadden to Martin. Martin had known Hatten since 1987. At one time, they had a fake business used to launder monies Martin made from drug sales.

Other than Davis' introduction of these defendants to Martin, there exists no evidence of any interconnection or cooperative activity between the defendants. Each of the defendants bought cocaine separately from Martin and sold crack through their own distribution chain in the West Palm Beach area.

Along with other counts, the government charged that the five defendants along with numerous co-defendants entered into two separate conspiracies. In Count 1, the government charged a conspiracy to manufacture and possess with intent to distribute crack cocaine, and under Count 2 a conspiracy to possess with intent to deliver cocaine and cocaine hydrochloride, both in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Little can be gained in further detailing the evidence produced in the defendants' lengthy trial. It is sufficient to note the evidence was overwhelming that each defendant purchased from Martin large amounts of cocaine, cooked it, and distributed it as crack. The fundamental issue on appeal is whether a joint trial under the allegations of a single conspiracy was justified.

The obvious advantage of a joint criminal trial of several defendants under a single conspiracy allegation is the avoidance of separate trials inuring to the benefit of the overall administration of justice. See United States v. Davenport, 935 F.2d 1223, 1236 (11th Cir.1991)(stating "Congress [has] recognized the utility of multi-defendant trials to effectuate the prompt efficient disposition of criminal justice"). However, the possible prejudice to defendants is the liberality of proof provided to the government by allowing evidence of other crimes and criminal activities undertaken by co-defendants. See, e.g., United States v. Gaviria, 116 F.3d 1498, 1533 (D.C.Cir.1997), cert. denied, --- U.S. **1251** ----, ----, 118 S.Ct. 865, 1086, 139 L.Ed.2d 763, 140 L.Ed.2d 143 (1998) (Risk of "spillover prejudice" may occur when a jury imputes evidence from one conspiracy to a defendant involved in a separate conspiracy.). In addition, courts must be alert to the fact that material variances between an indictment and the proof presented at trial can affect fair notice of the charges against which a defendant must respond. See, e.g., United States v. Coy, 19 F.3d 629, 634 (11th Cir.1994); United States v. Reed, 980 F.2d 1568, 1583 (11th Cir.1993).

Although there are scores of cases in this circuit as well as others in which criminal conspiracies approvingly have served as a basis for joinder of multiple defendants, [FN3] there are an equal number in which joinder has been disapproved. [FN4] It is therefore readily apparent that each case must stand on its own facts. The seminal case of Kotteakos v. U.S., 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is still the guidepost of connecting a "wheel" conspiracy. The Fifth Circuit reduced this definition in clear terms in Levine, 546 F.2d at 663. [FN5]

> FN3. See, e.g., United States v. Castro, 89 F.3d 1443, 1451 (11th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997); Reed, 980 F.2d at 1582-83; United States v. Stitzer, 785 F.2d 1506, 1518 (11th Cir.1986); United States v. Russell, 703 F.2d 1243, 1247 (11th Cir.1983); United States v. Mikolajczyk, 137 F.3d 237, 240 (5th Cir.1998); United States v. Dierling, 131 F.3d 722, 734 (8th Cir.1997), cert. denied, --- U.S.

----, 118 S.Ct. 1401, 140 L.Ed.2d 659 (1998).

FN4. See, e.g., United States v. Adkinson, 135 F.3d 1363, 1374 (11th Cir.1998); Coy, 19 F.3d at 633; United States v. Fernandez, 892 F.2d 976, 985-86 (11th Cir.1989); United States v. Castro, 829 F.2d 1038, 1045-46 (11th Cir.1987); United States v. Levine, 546 F.2d 658, 662-63 (5th Cir.1977); United States v. Morales, 113 F.3d 116, 119 (8th Cir.1997); United States v. Rosnow, 977 F.2d 399, 406 (8th Cir.1992).

FN5. We recognize that in order to prove a single conspiracy it is not necessary to show that all the conspirators were involved in each transaction or that all the conspirators even knew each other. See, e.g., United States v. Lemm, 680 F.2d 1193, 1204 (8th Cir.1982). However,

[f]or a wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise. Otherwise the conspiracy lacks "the rim of the wheel to enclose the spokes." If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the "wheel" is incomplete, and two [or more] conspiracies rather than one are charged.

Levine, 546 F.2d at 663 (internal citations omitted).

In United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), the Supreme Court overruled the portion of Levine that held misjoinder is per se reversible error. Lane, however, did not affect the Levine court's analysis of the requirements of a single "wheel" conspiracy.

[2] Although we have read the numerous cases cited by the government, [FN6] we believe each case has facts distinguishable from those adduced here. It is clearly not sufficient simply to say that the defendants each shared a common goal, to-wit: profit from the sale of cocaine. In order to constitute a single conspiracy there must be a single enterprise which sets up a common goal connecting each defendant. See, e.g., Coy, 19 F.3d at 633-34 (distinct distribution schemes and absence of overlapping participants indicates two separate conspiracies); Castro, 829 F.2d at 1045 ("similar illegal objective" not enough to support single conspiracy). No such single enterprise existed here. Each of the defendants functioned by themselves, separate and distinct from one another. There was no overlapping connection between them. The only thing each defendant had in common was their supplier. Thus, we find as a matter of law that the government has not proven a single conspiracy involving each of the defendants. The evidence merely shows Martin was the supplier who furnished cocaine to several independent buyers. Thus, at best, Martin engaged in several clusters of conspiracies.

FN6. United States v. LeQuire, 943 F.2d 1554 (11th Cir.1991); United States v. Gonzalez, 940 F.2d 1413 (11th Cir.1991); United States v. Laetividal-Gonzalez, 939 F.2d 1455 (11th Cir.1991); United States v. Jones, 913 F.2d 1552 (11th Cir.1990); United States v. Champion, 813 F.2d 1154 (11th Cir.1987); U.S. v. Stitzer, 785 F.2d 1506 (11th Cir.1986); United States v. Cole, 755 F.2d 748 (11th Cir.1985); United States v. Darby, 744 F.2d 1508 (11th Cir.1984); United States v. Brito, 721 F.2d 743 (11th Cir.1983); United States v. Grassi, 616 F.2d 1295 (5th Cir.1980); United States v. Michel, 588 F.2d 986 (5th Cir.1979); United States v. Perez, 489 F.2d 51 (5th Cir.1973).

*1252 [3][4] Notwithstanding the variance between the charge of a single conspiracy and the proof of multiple conspiracies, the cases are uniform in holding that to cause a reversal any variance must be prejudicial to the defendants. See, e.g., United States v. Calderon, 127 F.3d 1314, 1328 (11th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1090, 140 L.Ed.2d 146, --- U.S. ----, 118 S.Ct. 1328, 140 L.Ed.2d 490, --- U.S. ----, 118 S.Ct. 1854, 140 L.Ed.2d 1102 (1998); Coy, 19 F.3d at 633; Reed, 980 F.2d at 1581; United States v. Caporale, 806 F.2d 1487, 1500 (11th Cir.1986). Prejudice generally is measured in terms of whether the defendants were deprived of fair notice of the crimes for which they were being tried, and whether the spillover of the proof of other crimes prejudiced them. See Coy, 19 F.3d at 634; Caporale, 806 F.2d at 1500. Although the question is close, on the record presented, we conclude there was no prejudicial variance in this case.

First, the defendants were fairly apprised of their charged activity in purchasing cocaine from Martin and distributing it as crack. They each argued from the government's omission of joint evidence they knew nothing of Martin's operation or the purchase of cocaine from Acosta. Nonetheless, the evidence of their own purchase and distribution is left unimpeached.

The defendants also contend they were prejudiced by a spillover of evidence as the result of being grouped together in a joint trial. These claims of prejudice, however, are belied by two factors. First, the district court specifically instructed the jury that it must acquit a defendant of the conspiracy charges "unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges." R. 53 at 5590. The court also admonished that "a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator." Id. at 5589-90.

"When the proof at trial reveals the existence of more than one conspiracy, the adequacy of the trial judge's instructions are of critical importance in evaluating the likelihood that confusion or prejudice resulted from transference of guilt from one conspiracy to another." Rosnow, 977 F.2d at 407 (internal quotations omitted). In this case, the district court's careful instructions sufficiently limited the likelihood of any spillover of

evidence among conspiracies.

Secondly, the jury in this case returned different verdicts on different counts as to different defendants, and returned "not guilty" verdicts on a majority of the defendants. While McFadden argues he was prejudiced by a spillover effect, he himself was found guilty on one conspiracy count, but "not guilty" on another.

These divergent verdicts indicate the jury carefully followed the court's limiting instructions and had no difficulty compartmentalizing the evidence presented. We conclude there was no prejudicial variance in the joint trial of the defendants.

Martin's Cellular Phone

Heath argues evidence obtained from the interception of Martin's changed cellular telephone number should be suppressed because the judicial approval to intercept the new number was not valid under the Florida state wiretap statute. See Fla. Stat. ch. 934 (1998). He contends the interception of Martin's new number violated Florida law because:  1) it began with a prosecutor's unsworn telephonic request rather than a sworn, written application, 2) the judge gave verbal rather than written authorization for the change, and 3) the written addendum filed after the interception of the new number commenced did not mention the pre-existing, related wiretap of Glinton's cellular phone.

[5] As a general rule, "federal law governs the admissibility of tape recordings in federal criminal cases, and complaints that the evidence was obtained in violation of state law are of no effect." United States v. Mathis, 96 F.3d 1577, 1583 (11th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997) (internal quotations omitted). The difficulty in determining the applicable law governing admissibility in this instance lies in the nature of this particular investigation. The court in United States v. Bascaro, 742 F.2d 1335, 1347 (11th Cir.1984), stated that federal courts must defer to state **1253 law on the question of the validity of wiretap orders "obtained by state law enforcement officers in state courts." (emphasis added). The surveillance of Martin was conducted by a joint task force consisting of both state and federal law enforcement officers. While the task force was funded by the federal Drug Enforcement Agency, the wiretap applications were made by Assistant State Attorney Robert Shepherd and approved by Florida Circuit Court Judge Walter Colbath. Despite this ambiguity, for the purposes of this appeal, we will assume Bascaro applies and Florida state law governs the admissibility of this evidence.

[6] Florida courts have held that requirements under the state wiretap statutes [FN7] must be strictly construed. See Bagley v. State, 397 So.2d 1036, 1038 (Fla.Dist.Ct.App.1981); Wilson v. State, 377 So.2d 237, 240 (Fla.Dist.Ct.App.1979). [FN8] However, even under this standard, we find task force agents lawfully complied with the requirements set out under Florida's wiretap statute.

FN7. Fla. Stat. ch. 934.09(1) states:
Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under §§ 934.03-934.09 shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include ...
(e) A full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval for interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each such application.
Fla. Stat. ch. 934.06 states:
Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court ... if the disclosure of that information would be in violation of this chapter.

FN8. The Florida Supreme Court specifically has stated that oral communications conducted over a cordless phone within the privacy of one's home is protected by the Florida wiretap statute. See State v. Mozo, 655 So.2d 1115, 1116-17 (Fla.1995). In contrast, this court in Mathis stated that, before congressional amendments in 1994, "federal statutory law recognized no reasonable expectation of privacy on a cordless telephone." 96 F.3d at 1583. This raises the question whether under federal law any warrant would have been necessary to intercept Martin's cellular phone communications.

Heath does not dispute that the original application to intercept calls to Martin's cellular phone was fully sufficient. This application was made in writing, contained a full and complete statement of facts, and was duly affirmed by Judge Colbath on April 17, 1990.

At 11:00 a.m. on April 23, 1990, Martin's cellular number was reported "out of service." ASA Shepherd immediately telephoned Judge Colbath and advised him that Martin had changed his number. At noon, Judge Colbath verbally approved a change of the wiretap to Martin's new number. The next morning, on April 24, 1990, agents presented Judge Colbath a one-page addendum to their original wiretap request noting the telephone number change. See Government's Exhibit A-5. In support of the addendum, the agents attached and incorporated by reference a copy of the original application and authorization signed April 17. Heath argues the terms of the statute were violated when Shepherd verbally requested, and Judge Colbath verbally approved, the interception of Martin's new

cellular phone number.

The court faced a similar challenge under the Florida wiretap law in Bascaro, 742 F.2d 1335. As in this case, the amended wiretap application in Bascaro involved only a change in the suspect's telephone number. Id. at 1346. In finding that the amended application complied with the Florida statute, the Bascaro court explained:

As distinguished from a change in residence, a change in telephone number only could not conceivably have affected the efficacy of alternative investigative techniques. Nor ... could such a change call into question the continued existence of probable cause.... The naked formality of restating information in the amendment that would, in the context of this case, be necessarily identical in every respect to that presented one or two weeks before to **1254** the same circuit judge in the original application was not indispensable.

742 F.2d at 1348.

As in Bascaro, Judge Colbath was presented with a request to continue the interception of a suspect's telephonic communications, the only change being a new number assigned to the particular phone. All other relevant facts, most notably the continued existence of probable cause, remained as they were when Judge Colbath approved the initial application six days earlier.

[7][8] Even assuming the number change somehow rendered the original warrant invalid on April 23, any such infirmity was cured less than 24 hours later when agents filed an application to amend the original wiretap application. This addendum incorporated by reference a copy of the original application and authorization, making clear that all relevant facts presented to the court the previous week--with the exception of the actual number--were still applicable. [FN9]

> FN9. Heath's argument that the addendum is inadequate because it fails to mention the previous approval to tap Glinton's phone also is unavailing. Under the Florida wiretap statute, ch. 934.09(1)(e), a warrant application must report "all previous applications ... involving any of the same persons, facilities, or places...." The addendum incorporated by reference the previous application to tap Martin's phone. Under the plain language of the statute, the fact the addendum did not mention the previous tap on Glinton 's phone is irrelevant.

As the court found in Bascaro, restating identical information from an original application--when the only pertinent change is a new number--amounts to a "naked formality" that should not violate Florida's wiretap statute. See 742 F.2d at 1348. The district court's refusal to exclude this evidence was not in error.

Search of Heath's Residence

[9] After the police learned through the wiretap that Martin had arranged a sale and delivery to Heath of six kilograms of cocaine for $144,000, the police determined that entry into Heath's apartment to intercept the cocaine was necessary. They entered Heath's apartment without a warrant claiming that exigent circumstances existed. The government urges exigent circumstances existed because: (1) there was danger the cocaine could be removed, (2) the location of the apartment complex with the onset of dusk made visibility difficult, (3) there was a limited number of agents available, and (4) Martin had been informed that Carlos Acosta earlier had been stopped by police, and Heath may have been alerted to police surveillance. The government argues the warrantless entry was executed only to secure the premises while a search warrant was being obtained by other agents.

However, if the search warrant was obtained based upon information from an independent source, then the warrantless entry, even though illegal, would not require exclusion of evidence. See Segura v. United States, 468 U.S. 796, 805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); Murray v. United States, 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). The affidavit supporting probable cause in the present case, written by Deputy Martinez, stated "it was decided to secure said residence to prevent the loss or destruction of the above mentioned six kilograms of suspected cocaine, which were subsequently observed in plain view once the residence was entered and secured by agents of the Palm Beach County Sheriff's Office." Government's Exhibit S-4. (emphasis added). It is thus clear that the warrantless entry revealed facts upon which the affiant based probable cause.

Therefore assuming the warrantless entry was not justified by exigent circumstances, [FN10] the warrant itself must be appraised to determine whether it was sufficient to establish **1255** probable cause for the search on independent grounds. See Segura, 468 U.S. at 805, 104 S.Ct. 3380 (The exclusionary rule has no application where the government learned of the evidence from an independent source.) We find Martinez's affidavit established sufficient probable cause independent of the information disclosed in the warrantless search.

> FN10. This is a close question. Police overheard Martin's proposed sale to Heath on Martin's cellular phone between 5:30 and 6:00 p.m. on April 27. Martin, driving his gold Volvo, at 7:05 p.m. delivered the cocaine to Heath's apartment at 5090 # F Elmhurst. It was at that time Deputy Martinez started preparing his affidavit for a search warrant. Martin delivered the money to Carlos Acosta, who lived "across the street" from Heath. At 7:47 p.m., Carlos' vehicle, a blue Mazda, was stopped and searched and police seized over $100,000. At 8:05 p.m., Reinaldo Acosta told Martin that Carlos had been stopped. The government agents decided to execute a warrantless search shortly thereafter because they were afraid that Heath had been alerted to Carlos' stop and the seizure of the money.

Carlos Acosta was released at 9:00 p.m. The warrant was signed at 9:10 p.m. and served at 9:30 p.m.

The essence of Martinez's affidavit is that: (1) a past reliable confidential informant "stated" that on this same date, April 27, 1990, a six- kilogram cocaine transaction would take place at 5090 Elmhurst Road # F involving unknown black males; (2) surveillance revealed pedestrian traffic consistent with illegal narcotics transactions; (3) surveillance and information received from the confidential informant revealed that a blue Mazda 626 left the premises and was stopped by police in close proximity to the above address; (4) the vehicle was searched and a large amount of currency, over $100,000, was found; and (5) the reliable informant disclosed the drug transaction would involve the payment of $144,000 for the cocaine.

[10] Heath challenges the veracity of the affidavit and correctly points out that the information set forth was not completely accurate. Under these circumstances, Heath urges that the warrant should be suppressed under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In addition, Heath urges the warrant should be suppressed because the magistrate judge did not act in a neutral and detached manner.

This latter complaint focuses on the fact that the agents told the magistrate judge that the "confidential informant" referred to in the affidavit was actually a wiretap on Martin's cellular phone. Agents stated they wanted to preserve the secrecy of the wiretap in order to make future arrests. Thus, Heath argues, the magistrate judge was not neutral and detached but was in complicity with the prosecution in issuing the warrant based on a false affidavit. We cannot agree.

The magistrate judge was told the truth by ASA Shepherd and Deputy Martinez, to-wit: the "confidential informant" was a wiretap on Martin's cellular phone. We fail to see how receiving this information alone converts a magistrate judge into a tool for the prosecution. Confidentiality of the wiretap also could have been protected if the affidavit had been sealed. However, we do not believe the actions taken by the judge affect his neutrality and detachment.

Nor does the fact that the "confidential informant" referred to in the affidavit was actually a wiretap on Martin's phone affect probable cause. See United States v. Cruz, 594 F.2d 268, 271-72 (1st Cir.1979) (although information from "confidential informant" actually came from wiretap, affidavit sufficient to establish probable cause). In a broad generic sense, the wiretap served as a reliable provider, or "informant," of information. If there had been a live confidential informant under the circumstances set forth here, the government would not have been required to reveal the informant's name. We certainly do not condone a position that it is proper to lie under oath in a search warrant affidavit as long as the affiant orally tells the truth to the issuing magistrate judge. However in this instance, we do not feel that the warrant should be suppressed because the magistrate judge was not "misled by information." United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The fact that a wiretap was the basis for gaining confidential information does not detract from the reliability or veracity of the source. In fact, upon learning of the means by which this information was obtained, the magistrate judge could gain reassurance as to the veracity of the information.

[11] The issue the magistrate judge must always confront is whether, from the totality of circumstances, there exists probable cause to justify the issuance of the warrant. As the Supreme Court stated in Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983):

[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons.... Rigid legal rules are ill-suited to an area of such diversity. *1256 One simple rule will not cover every situation.

(internal quotation omitted).

In Franks, Justice Blackmun recognized that a warrant could be invalidated if a "false statement is necessary to the finding of probable cause." 438 U.S. at 156, 98 S.Ct. 2674. Such is not the case here. The fact that the confidential information was obtained from a wiretap rather than from a tipster does not, at least under the circumstances presented here, detract from the finding of probable cause.

Heath also attacks the credibility of the affidavit on other grounds urging the affidavit intentionally concealed Martin's involvement. The affidavit omits that Martin drove his gold Volvo to Heath's house and later gave the money to the Acosta brothers. The affidavit states Carlos Acosta left Heath's premises in a blue Mazda carrying the bag of money. The correct facts are that Martin delivered the cocaine to Heath, obtained the money, and later gave it to Acosta. Thereafter, Acosta drove from his home (across the street from Heath's apartment) and never was involved in the direct drug transaction between Martin and Heath.

Heath also argues that the statement in the affidavit that the stop of Acosta's vehicle took place within close proximity of Heath's residence was false. The stop of Acosta took place some eleven minutes away. If these facts were contrived out of thin air, they could constitute a material prejudice to Heath and any evidence obtained in the search of his home would have to be set aside. See Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir.1997) (Warrant affidavit violates Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit.). However, we find the government's explanation to be credible.

Sheriff's Deputy Martinez, who made out the affidavit, did not have direct knowledge of the search. Sergeant Kenneth White, who observed Martin's actions,

conveyed the information to Martinez. The facts given to Martinez caused him to state that the blue Mazda had left Heath's residence and was stopped in close proximity.

When considering the overall circumstances, the fact that Acosta was observed driving away from his premises across the street from Heath's apartment must be weighed along with the information relating to the actual cocaine sale between Martin and Heath. We conclude Martinez's statements were not a deliberate falsehood and were not made with reckless disregard for the truth.

[12] Although the affidavit does not reveal Martin's involvement, to- wit: delivery of the cocaine to Heath and delivery of the money to Acosta, the statement still shows that shortly after the drug sale, Acosta left the immediate vicinity of Heath's residence with the money Heath had given Martin. As often has been stated, minor discrepancies in an affidavit should not subvert an officer's good-faith revelations of facts establishing probable cause. See, e.g., Illinois v. Rodriguez, 497 U.S. 177, 184-85, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (Factual inaccuracies in warrant do not negate reasonableness of search.); Maryland v. Garrison, 480 U.S. 79, 88, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (Warrant still valid if inaccuracies in affidavit are "objectively understandable and reasonable."). The fact that the blue Mazda left the premises across the street from Heath's apartment, rather than directly from Heath's apartment, is an understandable misstatement and is not essential to the finding of probable cause.

The affidavit revealed that a transaction had occurred earlier at Heath's premises. This was true. The fact that the blue Mazda did not leave Heath's premises, but a nearby residence, merely was corroboration of the transaction. The blue Mazda did contain the money from the drug sale. Because we believe the factual discrepancies in the affidavit were not deliberate and did not undermine the probability that Heath possessed cocaine within his home, we find the search of Heath's apartment to be valid.

### Search of Hatten's Residence

[13] Police searched Hatten's apartment on May 4, 1990. Hatten challenges the search warrant that was issued on the grounds that the affidavit was false (i.e., there was no "confidential informant") and *1257 that no probable cause was shown because this was a "barebone affidavit." Hatten's attack on the warrant because it did not reveal that the source of the information was a wiretap is rejected for the same reason that we rejected the similar argument made by Heath. See supra.

[14] It is true one of the exceptions to the good-faith rule set forth in Leon is that the affidavit must not be a "bare-bone" statement of nothing more than conclusory allegations. See 468 U.S. at 915, 104 S.Ct. 3405. However, in the present case, we find Leon's good faith rule applicable. [FN11] We do not agree that the affidavit is solely conclusory. Under Leon, the

magistrate judge's determination of probable cause is not the issue, but rather whether the officers executing the warrant relied on that determination in good faith. See 468 U.S. at 909, 104 S.Ct. 3405. In view of the totality of circumstances set forth in this case, we find the magistrate judge's probable cause determination shields the officers who exercised the warrant.

FN11. As set forth in Leon, the good-faith rule allows "the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." 468 U.S. at 909, 104 S.Ct. 3405.

The affidavit submitted to the magistrate judge is not bare-boned. Hatten overlooks that the wiretap on Martin's phone revealed that Hatten attempted to purchase drugs on several occasions. He visited a home in Palm Beach County, which the police had under surveillance, on two occasions and was seen taking a bag in and out of the home. Leon requires the court to give deference to the magistrate judge's probable cause determination, and does not allow this court to analyze probable cause in the Aguilar-Ventresca tradition. [FN12] For this reason, we uphold the denial of the motion to suppress the evidence seized. [FN13]

FN12. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

FN13. Hatten also argues that he was prejudiced when the magistrate judge failed to make a recommendation to the district court before trial on his motion to suppress evidence. We find no merit in this argument.

### Search of Hatten's Vehicle

[15] Hatten also argues the warrantless search of his car on May 4, 1990 violated the Fourth Amendment, and evidence of the cocaine seized from the car should have been suppressed at trial. He contends that because the officers who actually stopped his car were not members of the task force, they "did not base their stop upon any articulable suspicion that Mr. Hatten was involved in narcotics activity," and therefore "fail[ed] to satisfy the requirements of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." Hatten Br. at 36.

The basic flaw in Hatten's argument is that Hatten's car was stopped after task force surveillance agents observed him meeting with Martin, a known cocaine dealer, and depart carrying a red gym bag. Two officers stopped Hatten's car upon radioed information from the task force. Clearly, observing this meeting with Martin provided police with a "minimal, objective justification for the stop." United States v. Williams, 876 F.2d 1521, 1524 (11th Cir.1989).

Hatten argues that Terry was violated because the officers who physically made the stop did not have

personal knowledge to reasonably suspect Hatten was carrying drugs. In Williams, 876 F.2d at 1524, the court observed that reasonable suspicion is determined by the collective knowledge of the officers involved in the stop. The fact that the task force officers who ordered the stop by radio had reasonable suspicion to believe Hatten was carrying drugs satisfies the Terry requirements for an investigative stop.

[16] Granted, officers had no probable cause to search Hatten's car until the drug-sniffing dog, which officers called to the scene, began scratching and biting at the car's driver-side door. However, a canine sniff is not considered a "search" for Fourth Amendment purposes. See United States v. Place, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); United States v. Holloman, 113 F.3d 192, 194 (11th Cir.1997). Therefore no search of Hatten or his vehicle was conducted until probable cause was determined. We hold the trial judge was correct *1258 in rejecting Hatten's motion to suppress evidence seized from his automobile.

Sufficiency of Evidence: Davis

[17] Albert Davis was convicted of two conspiracy counts: conspiracy to possess with intent to distribute cocaine, and conspiracy to manufacture and possess with intent to distribute cocaine base. He also was convicted of two substantive counts of manufacturing and distributing cocaine and crack. He argues that the evidence to support these charges is insufficient because the government's case "heavily and totally relied on the testimony of cooperating codefendant Jose Martin," and there is an "utter lack of corroborating evidence as it pertains to Albert Davis." Davis Br. at 25.

Assuming that Martin's testimony was true and Davis introduced Martin to the other buyers, Davis argues that "basic common sense would dictate that the defendant [Davis] would receive some kind of incentive or other form of benefit in that he made Jose Martin a very wealthy man." Id. at 26. Davis argues that because Martin testified that Davis received nothing in return for these introductions, this indicates that the introductions never took place. He calls the case against him "purely circumstantial." Id. at 28.

[18][19] First, as this court previously has noted, "existence of an agreement in a conspiracy case is rarely proven by direct evidence that the conspirators formally entered or reached an agreement.... The more common method of proving an agreement is through circumstantial evidence." United States v. Morales, 868 F.2d 1562, 1574 (11th Cir.1989). Second, when reviewing the sufficiency of evidence to sustain a conviction, the evidence is viewed in the light most favorable to the government. See, e.g., United States v. McLean, 138 F.3d 1398, 1405 (11th Cir.1998); Calderon, 127 F.3d at 1324. Finally, the court of appeals must accept all of a jury's inferences and determinations of witness credibility. See United States v. Carothers, 121 F.3d 659, 661 (11th Cir.1997).

Davis' claim that the evidence against him is "circumstantial" therefore is irrelevant. As noted, circumstantial evidence is often the only way to prove the existence of an agreement in a conspiracy case. Davis' claim of insufficiency of evidence on the substantive charges is refuted by evidence that: 1) he spoke to Martin on April 18, 1990, and stated he wanted to purchase three kilograms of cocaine; 2) Martin delivered three kilograms of cocaine on April 20, and Davis paid $23,500 per kilogram; 3) Davis complained to Martin on April 21 that two of the three kilograms of cocaine were not of sufficient quality to withstand the conversion to crack; 4) Martin spoke to Davis on April 27, and told him he would have cocaine from him the next day; and 5) Martin traveled to Miami on May 14 to purchase cocaine to sell to Davis and McFadden. This evidence is more than sufficient to support a finding of drug trafficking and a drug-trafficking conspiracy.

Equally unavailing are Davis' claims that the case against him relied heavily upon the testimony of Martin, a cooperating codefendant, and that "basic common sense" dictates he would have received some kind of benefit for introducing Martin to other buyers. We are bound by the jury's determination of Martin's credibility as a witness, and by its rejection of the inferences raised by the defendant.

Sentencing Issues

McFadden

[20] McFadden contends that his base offense level of 36 was incorrectly based upon the involvement of 50 to 150 kilograms of cocaine. This amount was drawn from Martin's statements that he sold McFadden two kilograms a week during the time they knew each other. McFadden argues that a review of the evidence showed that he received two kilograms in April 1989, two kilograms in May 1989, and nothing else during those months. The correct calculation, he argues, should be based on four kilograms. [FN14]

> FN14. McFadden also argues that assuming arguendo April and May 1989 can be used to assess the amount of cocaine delivered to him during the course of the year, two kilograms per month, rather than per week, would be a more reasonable estimate.

When a defendant argues that the district court made erroneous findings of fact and as *1259 a consequence applied the sentencing guidelines incorrectly, "the appellate court 'shall give due regard to the opportunity of the [sentencing] court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous.' " United States v. Park, 988 F.2d 107. 109 (11th Cir.1993) (quoting 18 U.S.C. § 3742(e)) (internal citation omitted).

[21] At sentencing, Agent Brillinger testified Martin told him that during the time frame of the conspiracy, he had supplied McFadden with approximately 100

kilograms of cocaine, delivering five or six kilograms on a monthly basis. [FN15] While McFadden may doubt the veracity of Martin's statements, he makes no showing that the district court's assessment of credibility in this regard was clearly erroneous. We therefore must accept the findings of fact of the district court in regard to the base level of McFadden's offense.

> FN15. While Agent Brillinger's testimony regarding Martin's statements is hearsay, both the sentencing guidelines and case law from this circuit permit a district court to consider reliable hearsay evidence at sentencing. See United States v. Query, 928 F.2d 383, 384-85 (11th Cir.1991); U.S.S.G. § 6A1.3 (a)(1997) (A sentencing court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Davis

[22] McFadden's codefendant Davis argues that he is entitled to be resentenced "based on the retroactive application of amendment 505 to the sentencing guidelines where the maximum base offense level under § 2D1.1 was reduced from 42 to 38...." Davis Br. at 30. Davis was sentenced on October 22, 1993; the amendments to the guidelines became effective November 1, 1994. Davis argues that "under U.S.S.G. § 1B1.10, the new guidelines as it [sic] pertains to the upper limits of the Drug Quantity Table were specifically made retroactive." Id. at 31.

[23] In arriving at Davis' sentence, the district court assigned a base offense level of 42. Subsequently, Amendment 505 to the sentencing guidelines established an upper limit of 38 on base offense levels calculated using drug quantity. See U.S.S.G.App. C, amend. 505 (1997). As Davis' base offense level would have been lower had he been sentenced after the effective date of Amendment 505, § 1B1.10 of the sentencing guidelines does authorize the district court to reduce his sentence. See U.S.S.G. § 1B1.10(c) (1997); United States v. Brown, 104 F.3d 1254, 1255 (11th Cir.1997). However, a court's power to reduce sentences under the applicable statute, 18 U.S.C. § 3582(c)(2), is discretionary. [FN16] See United States v. Cothran, 106 F.3d 1560, 1562 (11th Cir.1997).

FN16. Section 3582(c)(2) addresses reductions in sentences when the sentencing range has been lowered and provides as follows:
> The court may not modify a term of imprisonment once it has been imposed except that--
>
> . . . . .
>
> in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Davis suggests that under § 3582(c)(2) he is permitted to move the appellate court for a reduction in sentence. However, this court previously has stated that
> when, after a defendant has been sentenced, a guideline amendment occurs under circumstances in which the defendant becomes eligible for, but not automatically entitled to, a reduced sentence, we think it is preferable that the matter of sentence reduction be considered in the first instance by the sentencing court, not by an appellate court.

United States v. Vazquez, 53 F.3d 1216, 1228 (11th Cir.1995) (quoting United States v. Connell, 960 F.2d 191, 197 (1st Cir.1992)). Therefore we do not vacate Davis' sentence, but instead remand it to the district court to determine whether, in the court's discretion, **\*1260** an adjustment is warranted in light of Amendment 505.

Heath

[24] The district court calculated Heath's base offense level at 42, and assessed him a two-point upward adjustment under § 3B1.1 of the sentencing guidelines for a "managerial role" in the offense. The base offense level was determined based upon the amount of cocaine Heath purchased from Martin. The district court based Heath's managerial role adjustment upon three factors: 1) Heath bought more cocaine from Martin than other defendants; 2) co-defendants Charles Mosley and Travon Hines worked for Heath, and 3) Heath possessed $140,000 in cash on April 27, 1990. See R.60 at 68-69. We find that under the sentencing guidelines and Eleventh Circuit case law, these factors are not sufficient to support a managerial role adjustment.

[25] Section 3B1.1(c) of the sentencing guidelines provides for a two- level enhancement when "the defendant was an organizer, leader, manager, or supervisor in any criminal activity...." Under application note 2 to § 3B1.1, to qualify for an enhancement a defendant must have either been the organizer, leader, manager, or supervisor of one or more other participants, or "nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." The district court's determination is reviewed under the clearly erroneous rule. See United States v. Clark, 889 F.2d 1056, 1057 (11th Cir.1989).

[26] While the district court determined Heath played a managerial role because he purchased more cocaine than other defendants, the amount of contraband purchased by a defendant is not a listed factor in application note 3 to § 3B1.1. Even if the quantity of drugs purchased is large enough to infer that the

defendant knew they would be resold, a role enhancement is inappropriate absent evidence the defendant actively recruited buyers or directed their activities. See United States v. Alred, 144 F.3d 1405, 1421 (11th Cir.1998).

[27] While $144,000 in cash may be evidence that Heath was a large purchaser of cocaine, it alone does not implicate managerial control or supervision of others. A mere buyer/seller relationship is not a sufficient basis to assess a managerial enhancement. See United States v. Lozano-Hernandez, 89 F.3d 785, 790 (11th Cir.1996).

[28] The government also argues the enhancement was appropriate because evidence showed that Mosley and Hines "worked for" Heath. However, the government has the burden of proving by a preponderance of evidence the existence of the aggravating role. See Yates, 990 F.2d at 1182; United States v. De La Rosa, 922 F.2d 675, 679 (11th Cir.1991). The only evidence offered by the government that Mosley and Hines "worked for" Heath was the double hearsay statement by Agent Brillinger that Martin had told him Heath called Mosley and Hines part of his "group." See R.60 at 37-38. While this statement may imply Heath resold his drugs to Mosley and Hines, it does not support a finding that Heath in any way supervised or managed Mosley's and Hines' activities. See United States v. Brown, 944 F.2d 1377, 1381 (7th Cir.1991)(status as a distributor, standing alone, does not warrant an enhancement under § 3B1.1).

[29] A managerial enhancement cannot be imposed unless there is a preponderance of evidence that the defendant supervised or controlled others, or exercised some management responsibility over the activities of the criminal organization. See Lozano-Hernandez, 89 F.3d at 790. Because we believe the government has failed to meet this burden of proof, we conclude the district court erred by imposing the managerial enhancement to Heath under U.S.S.G. § 3B1.1(c).

Conclusion

For the reasons stated above, the convictions of the defendants are AFFIRMED. The sentences of Heath and Davis are REMANDED to the district court for resentencing.

END OF DOCUMENT